# LAW OFFICE OF SARAH KUNSTLER

315 FLATBUSH AVENUE #103 • BROOKLYN, NEW YORK 11217
(718) 783-3682 • FAX (347) 402-2014 • KUNSTLERLAW.NET

September 30, 2021

BY ECF AND EMAIL

Hon. Edward R. Korman
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re:     United States v. Wafa Abboud
        16 Cr. 396 (ERK)

Dear Judge Korman:

I write on behalf of Wafa Abboud, a 53-year-old woman who, nearly three decades ago, at age 24, came to the United States from Egypt to make a better life for herself. A naturalized U.S. citizen, Ms. Abboud spent decades working at agencies dedicated to the care of disabled New Yorkers, all the while suffering mental and physical abuse at the hands of her husband. She raised three children while working full-time, and in 2001, she founded Human First, an organization serving New Yorkers with developmental, psychiatric and neurological disabilities.

I was appointed after trial for the purposes of sentencing and for assisting Ms. Abboud with post-trial motions. Please accept this letter as an aid to the Court in its sentencing function. Given that Ms. Abboud intends to appeal her conviction, this letter does not address acceptance of responsibility, remorse, insight into criminal behavior, or any topic common to a traditional sentencing submission that could be read to further inculpate Ms. Abboud. Rather, this submission addresses why a below-Guidelines sentence is appropriate and sufficient, but not greater than necessary, to meet the goals of sentencing as outlined in 18 U.S.C. § 3553(a).

September 30, 2021
Honorable Edward R. Korman
Page 2 of 56

## I.    OBJECTIONS TO THE PSR

Ms. Abboud contests her conviction. As such, there are a number of facts outlined in the offense conduct section of the PSR to which she objects. We have elected not to contest these facts at sentencing. However, our failure to raise these objections to the PSR should not be construed as a waiver of Ms. Abboud's right to contest these facts on appeal.

### a.   Probation Miscalculated the Fraud Amount

**The Human First Fraud**

We object to the $1,187,000 attributed to Wafa Abboud by Probation for the Human First Fraud.

Probation calculates this fraud amount as follows:
- $998,000 for the amount deposited into Ms. Bailey's accounts from Human First.
- $189,000 based on an unauthorized salary increase allegedly received by Ms. Abboud

First, the $998,000 figure is incorrect.[1] At trial, the government presented evidence that $925,060.17 in Human First Funds was deposited into Ms. Bailey's accounts. Of this total, the government established that $419,000 was deposited into two accounts allegedly controlled by Ms. Abboud. Specifically, $240,000 was deposited into HBSC account X3555, and $179,000 was deposited into TD account X5387.  (*See* Government Trial Exhibit 135, "Flow of Funds Going from Human First to MPB Bank Accounts,) and PSR §§ 21, 33, 34, 48, 50.)

At Marcelle Bailey's sentencing, your Honor held Ms. Bailey responsible for her portion of the fraud; namely, the funds that were deposited into the two accounts controlled wholly by Ms. Bailey. We do not concede that HBSC account X3555 and TD account X5387 were

---

[1] In the victim impact materials submitted Cheryelle Cruikshank on behalf of Human First,  Ms. Cruikshank inexplicably raises this total to $998,000. However, this figure is at odds with the evidence presented at trial.

September 30, 2021
Honorable Edward R. Korman
Page 3 of 56

controlled by Ms. Abboud. Nonetheless, viewing all evidence in the light most favorable to the

government, we ask the Court to apply the same logic with respect to Ms. Abboud. As such, the

highest amount chargeable to Ms. Abboud for her "share" of the funds deposited into Marcelle

Bailey's accounts is $419,000.

We further object to the addition of $189,000 for an alleged unauthorized salary increase.

This figure added to Ms. Abboud's loss total based on the victim impact statement submitted by

Cheryelle Cruikshank, which claims that Ms. Abboud received an unauthorized salary increase

of $3,500 on April 1, 2014, which she continued to receive over 54 pay periods, resulting in the

addition of $189,000 to Ms. Abboud's fraud calculation. However, the evidence introduced at

Ms. Abboud's trial did not establish that these increases were fraudulent.[2] While Board Member

Sharon Jones recalled that Ms. Abboud's salary, was, at most, $400,000/year, (TT 356), and that

Ms. Abboud was not entitled to obtain a salary increase without Board approval (T361), Ms.

Jones also testified that the Board approved a resolution agreeing to pay Ms. Abboud

$221,538.34 for 960 hours of unused vacation time. (TT 1105-1106,[3] Defense Exhibit SJ-28)

This figure was clearly calculated based on a salary of $480,000, as follows:

> 52 weeks/year X 40 hours/week = 2,080 hours
> $480,000/2080 hours = hourly rate of $230.77 (rounded up)
> 960 hours of unused vacation time X $230.77 = $221,539.20

While the Board's $221,538.34  does not round up the hourly rate, calculating it at

approximately $230.769 rather than $230.77, it is clear they are basing Ms. Abboud's vacation

---

[2] Even assuming Ms. Abboud's salary increases over $400,000 were unauthorized –  a fact which
we do not concede – Ms. Cruikshank's calculations do not square with the increases reflected by
Ms. Abboud's paystubs, which show that  Ms. Abboud's bi-weekly pay went up from 13,999.44
to $15,517.46 on April 1, 2014, and from  $15,517.46 to $17,395.35 on October 10, 2014,
resulting in a total increase of $156,120 – and not $189,000 as calculated by Human First.
[3] Citations to "TT" are to the trial transcript.

September 30, 2021
Honorable Edward R. Korman
Page 4 of 56

entitlement on an hourly salary of $230.769, which roughly translates into a yearly salary of

$480,000. Ultimately, the Board of Human First reversed course, and Ms. Abboud never

received compensation for this unused vacation time. However, the fact that the Board calculated

Ms. Abboud's vacation time in this way is evidence that they were aware of, and approved of,

Ms. Abboud's $480,000 yearly salary.[4] For this reason, the $189,000 for an alleged unauthorized

salary increase is in error.[5]

Given the above, we ask that Ms. Abboud be held responsible for a total of $419,000 for

the Human First Fraud.

**The Mortgage Fraud**

At Marcelle Bailey's sentencing, your Honor subtracted the $975,662.68 calculated by

Probation for the mortgage from Ms. Bailey's loss total, on the theory that there was no actual

loss to the bank. Your Honor was correct in doing so, and we ask the Court to apply the same

reasoning in Ms. Abboud's case.

Under the commentary to U.S.S.G. § 2B1.1, Probation and the Court are instructed to

reduce the loss amount by certain "credits against loss." "[I]n a case involving collateral pledged

---

[4] We note that a salary of $480,000/year is not unusual for CEOS for agencies working with OPWDD. For example, according to the 2019 990 Form for Plus Group Homes, an OPWDD agency with an annual program service revenue of $10,161,096, the CEO is paid $498,842 (See Selected Pages from Plus Group Homes 990 Form, attached as Exhibit W.) While OPWDD regulations presumptively cap CEO pay at $199,000, executive compensation can (and often does) exceed that amount provided it is less than "the 75th percentile of that compensation provided to comparable executives in other providers of the same size and within the same program service sector and the same or comparable geographic area as established by a compensation survey identified, provided, or recognized by the [State]." *See* https://opwdd.ny.gov/frequently-asked-questions

[5] We note that even if the Court is not persuaded by our arguments concerning the additional $189,000 added by Ms. Cruikshank for the alleged unauthorized salary increase, this additional loss amount does not affect the Guidelines calculation as the total loss amount would still be under $1.5 million.

or otherwise provided by the defendant," these credits are defined as "the amount the victim has recovered at the time of sentencing from disposition of the collateral, or if the collateral has not been disposed of by that time, the fair market value of the collateral at the time of sentencing." U.S.S.G. § 2B1.1 cmt. n. 3(E)(ii). In the case of a fraud involving a mortgage loan, "if the collateral has not been disposed of by the time of sentencing, use the fair market value of the collateral as of the date on which the guilt of the defendant has been established, whether by guilty plea, trial, or plea of nolo contendere." U.S.S.G. § 2B1.1 cmt. n. 3(E)(iii). In mortgage fraud cases, "there shall be a rebuttable presumption that the most recent tax assessment value of the collateral is a reasonable estimate of the fair market value. In determining whether the most recent tax assessment value is a reasonable estimate of the fair market value, the court may consider, among other factors, the recency of the tax assessment and the extent to which the jurisdiction's tax assessment practices reflect factors not relevant to fair market value." *Id.*

To determine actual loss under U.S.S.G. § 2B1.1, the Second Circuit has adopted the two-step process used in *United States v. Mallory*, 709 F.Supp.2d 455 (E.D. Va.2010), *aff'd*, 461 Fed.Appx. 352 (4th Cir. 2012). See *United States v. Turk*, 626 F.3d 743, 749-50 (2d Cir. 2010). First, the sentencing court must determine "the foreseeable pecuniary harm resulting from the fraud, and second, [it must apply] any credits against loss from sale of the collateral, as required by Application Note 3(E)(ii)." *Id*. at 749. This calculation is made as of the time of sentencing, and "the only loss that need have been foreseeable to the defendant is the loss of the unpaid principal." *Id*.

In this case, under the first step of the *Mallory* test, the loss is the unpaid balance is $ 975,662.68. Under Application Note 3(E)(ii) and (iii) to U.S.S.G. § 2B1.1, the fair market value at the time guilt was established *must* be applied under the second step, as a credit against loss to

September 30, 2021
Honorable Edward R. Korman
Page 6 of 56

reduce the loss amount for the purposes of calculating the loss amount for which Ms. Abboud

should be held accountable under the Guidelines.

In mortgage fraud cases like this one, where the collateral has not yet been sold, there is a

rebuttable presumption that the fair market value is equal to the tax assessment value. See

Application Note 3(E)(iii) to U.S.S.G. § 2B1.1.

The 2020 tax assessment for 2739 Merrick Avenue is $1,218,800.[6] (*See* Exhibit A, 2020

Town of Hempstead Property Tax Assessment, attached.) Following Application Note 3(E)((iii)

to U.S.S.G. § 2B1.1, we have therefore calculated the loss as follows:

Unpaid mortgage balance:     $ 975,662.68
2020 Tax Assessment Value:  - $1,218,800.00
Balance:                    (-   $243,137.32)

Therefore, pursuant to the United States Sentencing Guidelines, the loss amount for the

mortgage fraud is negative $243,137.32, or an effective loss of zero.


**Adjusted Loss Amount Calculation**

Based on the above, we ask the Court to calculate the loss amount as follows:

$419,000 (Counts 1 and 2 – the Human First Fraud w/ Marcelle Bailey
$417,000 (Counts 3 and 4) – the Human First Fraud with Rami Taha
$0          (Counts 5 and 6) – the Bank/Mortgage Fraud
_____
    **Total: $836,000**

As illustrated below, a loss amount of more than $550,000 but less than $1.5 million

results in 14-point increase to the offense level, as opposed to the 16-point increase assessed by

probation for a loss greater than $1.5 million.

---

[6] This is considerably lower than Nassau County's calculation of the fair market value of the property, which is over $2 Million. (*See* Exhibit B)

September 30, 2021
Honorable Edward R. Korman
Page 7 of 56

## II.     THE APPLICABLE GUIDELINES RANGE

Given the above, the Guidelines calculation should be adjusted as follows:

| | |
|---|---|
| Base offense level (U.S.S.G. § 2B1.1(a)(1)): | 7 |
| Loss greater than $550,000 (U.S.S.G. § 2B1.1(b)(1)(H)): | 14 |
| Specific Offense Characteristic: U.S.S.G. § 2S1.1(b)(2)(a)): | 1 |
| Role Enhancement – Leadership U.S.S.G. § 3B1.1(c): | 2 |
| Role Enhancement – Abuse of Trust U.S.S.G. § 3B1.3: | 2 |
| Total | 26 |

With an adjusted offense level of 26, and a criminal history category of I, the applicable advisory guidelines range is 63-78 months. We ask that the PSR be amended consistent with these revised loss amounts and calculations.

## III.     18 U.S.C. § 3553(a) FACTORS

**The History and Characteristics of Wafa Abboud**

**Ms. Abboud's Childhood in Egypt**

Wafa Abboud was born in Tanta, Egypt, on October 29, 1967. Both of her parents are deceased. Her mother, Nabowia Soliman, a homemaker, died from heart disease in 1992. Her father, Abdalaziz Abboud, died in 1989 from a stroke. Before his death, Mr. Abboud worked as a regional supervisor for the electric department for the railroad, and was ranked as an assistant engineer.

Ms. Abboud was raised in an upper middle class household. She is the youngest of seven siblings, three of whom are now deceased. Her three living siblings all live in Egypt. Ms. Abboud's brother Ahmed Abboud (age 67), has two children, is divorced, and works as a banker. Another brother, Abraham Abboud (age 61), owns an automobile repair shop and is married with five children. Ms. Abboud's sister, Zinab Abboud (age 65), is a retired administrator who is married with four children. Ms. Abboud's sister, Fatma Abboud, died in 2015 from cancer; she

September 30, 2021
Honorable Edward R. Korman
Page 8 of 56

was divorced with four children. Another sister, Fatiha Abboud, was married with four children when she died from pancreatic cancer in 2004.

In 1973, Ms. Abboud's oldest brother, Mohmad Abboud, a lieutenant in the Egyptian Army and a recent college graduate, was killed during the Arab-Israeli war. He was 24 years old. Ms. Abboud was six years old at the time. After her brother's death, she recalls that her mother was never the same. Nobowia Soliman's health declined; she developed a heart condition, liver problems, and high blood pressure that would plague her for the rest of her life.

By the time Ms. Abboud was nine years old, her older sisters were married and out of the house. As the only female child at home, it fell to Ms. Abboud to become her mother's caretaker, figuring out the dosages of her mother's medications and accompanying her to doctor's appointments.

Despite these greater responsibilities. Ms. Abboud recalls her childhood as stable and loving.  Ms. Abboud was very attached to her family and considered herself a "home body," with very few friends outside of the home. She started cooking at age 11, and enjoyed cooking for the family and their visitors.  Her family had an "open door" household, with Ms. Abboud's older siblings and their children, extended family members, friends and neighbors visiting all the time. Ms. Abboud and her parents lived on the fourth floor of a five-story apartment building they owned. Ms. Abboud's brother Ahmed lived upstairs with his family, and three tenants lived on the three lower floors.

**Ms. Abboud's Young Adulthood and Move to the United States**

Ms. Abboud did well in school and was accepted to Cairo University to study archaeology. When she was in her second year of college, Ms. Abboud's father died suddenly of a stroke. As she writes in her letter to the Court, "It was at the time of my final exams and it was

September 30, 2021
Honorable Edward R. Korman
Page 9 of 56

the first shock in my life." (*See* Exhibit C, Letter from Wafa Abboud.) Ms. Abboud's father had

suffered from an earlier stroke years before, from which he recovered, and was taking his

medication, and had no health issues. Usually the first to rise, one morning, Abdalaziz Abboud,

did not get out of bed. Ms. Abboud's mother sent her to her father's room to wake him for

breakfast. She tried to wake him, but he was unresponsive and would not wake. Mr. Abboud was

taken to the hospital by ambulance, where he died several hours later.

For Ms. Abboud, life lost all meaning after her father's death. She felt hollowed out, like

she was walking around with a gaping hole in her chest. Ms. Abboud didn't finish her exams,

and would later have to repeat the semester. She clung to her mother, to whom she was very

attached. She spent the summer inside her family's apartment, listless, without the desire to do

anything. At the start of the next semester, Ms. Abboud realized she had to pull herself together

for her mother, who needed her and wanted to see her get her education and success. Thus, she

returned to school.

Ms. Abboud graduated college, and began working at the Cairo museum while she

worked on a master's degree. She would spend the week in Cairo and would go home to Tanta

on the weekends, which was an hour away. Three years after her father's death, in April of 1992,

Ms. Abboud's mother died, like her father, quite unexpectedly, after a heart attack. Ms. Abboud

was 24 years old. Ms. Abboud arranged her mother's funeral, and following her mother's wishes,

traveling with her mother's body to a neighboring town to be buried alongside her grandmother.

The death of both of her parents in the span of a few years sent Ms. Abboud into a debilitating

depression. She describes herself as "shattered," having lost the only people in the world who

really loved her.  Having already completed one year of a two-year master's program, she was

September 30, 2021
Honorable Edward R. Korman
Page 10 of 56

unable to continue with her thesis project. After taking a leave of absence from her job at the

Cairo museum, she returned to work part-time.

During this time, Ms. Abboud's older sister, Fatma, convinced her to move to the United

States, where Fatma had lived for 15 years and had built a life for herself. Twenty years older

than Ms. Abboud, Fatma was like a second mother to her. At the time, Ms. Abboud was working

at the Cairo museum and working on a master's degree. But she was sad and alone, and Fatima's

promise to treat Ms. Abboud like one of her own children felt like a life line.

Ms. Abboud came to the United States in August of 1992. When she arrived, the reality

was far different. Fatma told Ms. Abboud she had her own problems, and did not have enough

money to support her own children. She told Ms. Abboud that she needed to work or get married

and become self-supporting. Fatma's husband found a suitor, a 53-year-old man Indonesian man

with whom Ms. Abboud shared nothing – not even a common language. Ms. Abboud felt

trapped. As she writes in her letter to the Court,

> If I had known these things, I would not have left my country, quit my job, and
> withdrawn from my graduate program. I had nothing to return to. The only person
> I had here in the U.S. was my sister, and our relationship was an emotional
> rollercoaster. It was up and down; she was my best friend one month and then she
> would cut me off for a few months for no reason I could understand. I wanted to
> go home to Egypt, but my sister convinced me it would be too embarrassing if I
> left. She pressured me to stay and I stayed.

(Exhibit C.)

Desperate to find another solution, Ms. Abboud remembered Reda Soliman, a

charismatic young doctor she had met in Egypt, when he was doing his mandatory service in the

army. Mr. Soliman's best friend was a friend of Ms. Abboud's, and visited Ms. Abboud at the

museum with Mr. Soliman, where she gave them a tour. Ms. Abboud met Mr. Soliman one more

time before she left Egypt. When Ms. Abboud was in the United States, they spoke several more

September 30, 2021
Honorable Edward R. Korman
Page 11 of 56

times on the telephone, and discussed marriage. Ms. Abboud told Mr. Soliman that in order to

ask for her hand, he had to go see her family to make the arrangements, and sent him to meet

with her older brother, who was her "proxy" in Egypt, the equivalent of holding a legal power of

attorney to handle her affairs.

**Ms. Abboud's Marriage to Reda Soliman and the Cycle of Abuse**

A month later, in September of 1993, Ms. Abboud learned that she and Mr. Soliman had

been married in Egypt, by proxy. She was shocked. Ms. Abboud thought that her brother would

ask for her input, or at least consult her before going through with the marriage, or that Mr.

Soliman would have reached out to her to let her know that the marriage was going forward. But

no one did. Ms. Abboud, sold like a of chattel from one family to another, felt dehumanized and

demoralized.

Ms. Abboud, who had an H1 employment visa[7], helped her new husband apply for a visa

to come to the United States on an H4 spousal visa. When he arrived, in December of 1993, he

was nothing like the person she remembered. They were legally married on January 1, 1994 in

Queens, New York at Fatima's home. Before the January wedding, Ms. Abboud and Mr.

Soliman lived apart. Mr. Soliman lived with Ms. Abboud's brother Ibrahim, and Ms. Abboud

lived with her sister. Of the wedding, Ms. Abboud writes:

> It was not exactly a wedding. We had a small cake at my sister's house. It was a
> miserable occasion. Reda felt it was insulting to him that we did not have a nice
> celebration in his honor, and he let us know he was bitter about it. But, he was not
> willing to pay for anything. Even on the first night of our marriage, he started to
> break me down psychologically. He was critical about me, about my body, and
> said he "deserved better."

(Exhibit C.)

---

[7] At the time, Ms. Abboud was working for an architect, using her archeology training to consult
on building projects.

September 30, 2021
Honorable Edward R. Korman
Page 12 of 56

This was the beginning of years of psychological and physical abuse. Reda Soliman beat Ms. Abboud and called her names. During the first year of their marriage, Ms. Abboud called the police several times, but was too afraid – and felt too alone – to tell them that her husband was beating her. She also feared the repercussions in her family and community, that she would be blamed for the failure of their relationship. She explains:

> [I]n my culture, at that time, 27 years ago, if you get divorced in the first year, they think something is wrong with you. Our women are blamed for everything, which resulted in most women just living with abusive relationships.

(Exhibit C.) The abuse continued. Mr. Soliman, who could not work as a doctor in the United States without taking additional exams, blamed Ms. Abboud for his inability to work. He spent years studying for medical boards that he never took, making Ms. Abboud responsible for supporting their family.

**Motherhood, Abuse, and Ms. Abboud's Career in Social Services**

Ms. Abboud was introduced to social services in early 1994 when she got her first job with the African Services Committee ("ASC"), a non-profit organization in New York focused on HIV prevention and access to treatment for people living with AIDS. As an outreach coordinator with ASC, Ms. Abboud spent long, tiring days doing outreach in high-poverty African immigrant communities throughout the five boroughs, promoting community awareness of HIV/AIDS and available health services.

Ms. Abboud lived in constant fear of her husband's moods. She recalls one day when, at the end of a long shift with ASC, she and the outreach workers were unable to locate the van driver who had taken them to the Brooklyn neighborhood where they had spent the day working. By the time they found the driver, their shift was long over, and Ms. Abboud was hours late

September 30, 2021
Honorable Edward R. Korman
Page 13 of 56

returning home. In a time before the ubiquity of mobile phones, Ms. Abboud recalls how scared she was, frantically calling home from a payphone to tell Mr. Soliman what had happened, but unable to get through. When she finally arrived home, she recalls being "so scared I was shaking." In the middle of her explanation of why she was late, Mr. Soliman slapped her in the face, telling her that it was unacceptable to be late, when she knew a man was home waiting for her.

The slap pushed Ms. Abboud past the breaking point. "I lost it, she writes, "and started screaming and crying, saying I wanted a divorce." (Exhibit C.) Mr. Soliman ripped their home phone from the wall. A neighbor who heard Ms. Abboud crying and screaming, came over to take Ms. Abboud to her apartment, where she sobbed for hours. Eventually, Mr. Soliman came to the neighbor's apartment to apologize, telling her that if she forgave him, he would never hit her again. It was a promise he did not keep.

During their second year of marriage, in 1995, Ms. Abboud became pregnant with the couple's oldest daughter, Noreen Soliman. The pregnancy was difficult and Ms. Abboud suffered from preeclampsia. While Ms. Abboud was pregnant, she also developed problems with the sciatic nerve in her right leg. Ultimately, she had no choice but to leave her job with the African Services Committee and go on disability, earning far less than she had with ASC.

At that time, Reda Soliman was working full-time as a case manager for people with disabilities at AABR[8] where he was supervised by Ms. Abboud's sister, Fatma, who helped him get the job. Fatma also helped Mr. Soliman get a second part-time job with The ARC,[9] another

---

[8] AABR was first founded in 1956, and has blossomed into a leading service provider for individuals with developmental disabilities in the New York metropolitan region. *See* http://aabr.org/history/

[9] *See* https://autismnow.org/about-us/

September 30, 2021
Honorable Edward R. Korman
Page 14 of 56

agency specializing in autism. Mr. Soliman refused to take direction from Fatma, and did not

prepare the comprehensive case management notes required by the position. He was ultimately

fired from both jobs.

Noreen Soliman was born in March of 1996. When Noreen was five months old, Ms.

Abboud went back to work. She found a job as a case manager with the Association in

Manhattan of Autistic Children, Inc. ("AMAC"), a non-profit organization specializing in

providing services to help people of all ages with autistic-spectrum disorders and their families.

Her salary was $25,000/year. Shortly after Ms. Abboud was hired, her supervisor had a family

emergency and left the agency. Ms. Abboud was on her own with 37 cases and a pending state

audit. She describes the experience as akin to "learn[ing] how to swim by being thrown in the

water." Ms. Abboud writes:

> It was my introduction to the field of development disability, and I fell in love with
> the work. I saw that society treats people with disabilities as though they are not
> people. Every child I saw, I thought, what if my daughter is like that? My heart
> went to the parents a lot.

(Exhibit C.)

Ms. Abboud committed herself to her work as a case manager at AMAC, quickly rising

through ranks to become a supervisor and finally, a director. The work was all consuming, but

Ms. Abboud didn't mind the long hours or the challenges she faced on behalf of her clients. The

job provided an escape from the chaos of her home life. Ms. Abboud writes: "While my life was

out of control, this was a way for me to have some control. It was actually something rewarding

in my life." (Exhibit C.)

At home, there was a brief respite from abuse after Noreen's birth. But by the time Ms.

Abboud returned to work, the abuse had resumed. The mental and psychological abuse was non-

September 30, 2021
Honorable Edward R. Korman
Page 15 of 56

stop –Mr. Soliman told Ms. Abboud she was worthless, ugly, stupid, and less than he deserved.

Unable to pass his medical boards, he blamed her for his continuing failure to work in his chosen

field. The physical abuse was cyclical – Ms. Abboud reports that Mr. Soliman would blow up

and hit her, and then there would be a break in the physical violence for nine or ten months

before he would hit her again.

> Ms. Abboud recalls the abuse in her letter to the Court:

> I could never predict what was going to make Reda angry. There would be
> escalation from a normal conversation to being hit in less than a second, I never
> saw it coming. When somebody hits you in the face, the confusion is huge. I was
> very confused. Many times, I ended with marks on my face and one of these hits
> resulted in a black and blue eye and a permanent injury that I still have to this day.
> I have lost the feeling in the upper left side of my lips from how hard he hit me.
> Reda thought a good Egyptian wife should be quiet even if she was hit. As a
> doctor, he used medical terminology to convince me that I wasn't normal that I
> was overreacting and being dramatic when I cried or screamed after he hit me.
> Even if the physical abuse stopped sometimes or at least it wasn't as frequent or
> as strong, he substituted it by enhancing the emotional and mental abuse. It was
> worse than giving me a black and blue eye. He tormented me and he was good at
> it. He took advantage of the fact that I was a private person. I was so embarrassed
> I hid what was going on for years from even my sister.

(Exhibit C.)

> Ms. Abboud recalls one incident, in 1998, when her husband slapped her in the face when

she was pregnant with the couple's second child, Yasmine. There was nothing particularly out of

the ordinary about Mr. Soliman's behavior, but this time, Ms Abboud somehow found the

courage to leave and went to her sister Fatma's house for two days, taking two-year old Noreen

with her. She also remembers telling Fatma, the first time that she shared Mr. Soliman's abuse

with her sister. Fatma told Mr. Soliman not to touch Ms. Abboud ever again, but it was an empty

threat. For Ms. Abboud, divorce was never an option. She had a small child and another on the

way, and had been taught to respect the institution of marriage. But the charming young man she

September 30, 2021
Honorable Edward R. Korman
Page 16 of 56

had met in Egypt was nowhere to be seen; Ms. Abboud never came to love – or even to like – the

man she married.

Ms. Abboud describes years of physical and mental torment. The abuse took a toll. "For

many years, she writes, "I did not feel the ground under my feet. I felt like I was floating with no

sense of stability. I was always waiting for that feeling he was going to come at me and torment

me." (Exhibit C.) "The physical abuse, she writes, "was almost easier" than the mental abuse.

Ms. Abboud explains:

> A hit is a hit. It's tangible. We all know that what the person did is wrong. But,
> mental abuse is hard to see, it is hard to see what having someone torment you and
> belittle you all the time does to you psychologically. He would tell me he hated
> me, that my family hated me, that everyone hated me. He would say, "I am going
> to put you in jail, or a mental institution." He would tell me how a physician can
> kill his wife with injections of insulin, and no one will suspect anything. He would
> say things like, "It's very dangerous to be married to a doctor." I thought he was
> being silly or joking, but then I found out he had started to tell people I was
> mentally ill. Two of my nieces who are physicians came to me, and he had told
> them I had bipolar disorder. Their mother, my sister Fatima told me to be careful
> because she thought he was trying to establish that I was mentally ill. I even went
> to a doctor to get it checked it out, just to see if there was anything to what he was
> saying. The doctor told me I was not bipolar at all. That's when I started to take
> my ex-husband's threats more seriously.

(Exhibit C.)

In 1997, Ms. Abboud and Mr. Soliman bought their first home, moving out of the

one-bedroom apartment in Ozone Park, Queens, where they had begun their lives together,

into a dilapidated home in Valley Stream, Long Island. The house was in foreclosure, and

Ms. Abboud and her husband and a friend of Mr. Soliman's worked to make it livable.

They rented an upstairs unit to make ends meet. That year, Ms. Abboud heard of an open

caseworker position at Catholic Charities, supervised by Ms. Abboud's former supervisor

at AMAC. Ms. Abboud helped Mr. Soliman get this job, which he left after three months.

September 30, 2021
Honorable Edward R. Korman
Page 17 of 56

Ms. Abboud's work was her refuge – her safe space. She was respected by her peers and colleagues, appreciated by her clients, challenged by her work. She felt like a capable, successful person, who was doing good in the world, while making money to support her family.

In 1998, Ms. Abboud's second child, Yasmine was born. Ms. Abboud recalls that she took only two weeks' maternity leave before returning to work.  She writes, "I loved my work I was so attached to it. I also had a crazy sense of responsibility. I had to be there for people." (Exhibit C.) Ms. Abboud was able to work as hard as she did with the support of a dedicated babysitter, Debbie, who lived in Ozone Park; Debbie had cared for Noreen full-time, and for two years, and after Yasmine's birth, she cared for both children. Every morning, Ms. Abboud drove 10 miles from Valley Stream to Ozone Park to drop off her children before going to work, and every evening, she made the reverse trip. She writes: "I was late many times at work, but I was lucky that Debbie didn't mind keeping the girls late. Debbie and her whole entire family loved the kids as if they are their own. Knowing the kids were safe and cared for allowed me to work like I did." (Exhibit C.)

 During this time, Ms. Abboud's husband continued to "study" for the U.S. medical boards. Mr. Soliman was not working, made no financial contribution, and did not participate in childcare or housework. When Ms. Abboud returned home from work, she worked to get dinner on the table. On weekends, she did the shopping and housework.

In February of 1999, Ms. Abboud left AMAC, moving to a small agency called Special Citizens Futures Unlimited, a non-profit organization headquartered in the Bronx that ran group homes and provided other services to adults and children with Autism Spectrum Disorders. The organization was run by Anita Zatlow, the mother of an autistic son, and her daughter, Gerri.  "In the 37 years that I was involved with the agency," Gerri Zatlow writes, in her letter of support,

September 30, 2021
Honorable Edward R. Korman
Page 18 of 56

"Wafa stands out as the most like-minded and dedicated person ever to join our agency." (*See*

Letter from Gerri Zatlow, attached as Exhibit D.)

According to Ms. Zatlow, at the time Ms. Abboud joined the team at Special Citizens, the

agency "sought someone with skills to develop a new position providing services to autistic

children living at home, many of whom were living without any supports." Ms. Zatlow

continues,

> Wafa took on the job with the gusto of a person twice her age, wise in decision
> making, and phenomenal at problem solving. As one can imagine, a task like this
> is often fraught with dilemmas. The hiring, training, and firing of staff, the
> selection of services for families who had never received supports and the
> problem solving in crisis families can be overwhelming. Wafa took every duty
> and met every obstacle with finesse.

(*See* Exhibit D.)

At Special Citizens, Ms. Abboud loved the challenges, and the clients. She loved helping

families navigate the Medicaid bureaucracy, getting them the services she could. She thrived on

"challenge cases," the cases no one else liked to work on, because they required extra attention at

time. When she got a "challenge case," she gave herself 30 days to help improve the client's

behavior – to find a way to help them stay in their home. During this time, she worked to find the

reason for the client's behavior issues; rather than opting for sedation or institutionalization, she

searched for the source of the problem.

One of Ms. Abboud's biggest successes while at Special Citizens was the help she

provided to a client named Douglas, who was Anita Zatlow's son. Douglas, who lived in a group

home run by Special Citizens, would throw destructive tantrums when upset. He required one-to-

one supervision to prevent him from breaking things, meaning that a staff-person was assigned to

him at all times. Ms. Abboud worked to improve Douglas' life. She writes:

September 30, 2021
Honorable Edward R. Korman
Page 19 of 56

> We made the home environment safe for him so that he did not need someone
> sitting with him every second of the day. For example, we changed lightbulbs and
> used recessed lights. Instead of glass, we used wood. We bolted things to the
> ground. But we gave him a normal sense of freedom in his house instead of
> making his home like an institution. We found out, he liked going to library, and
> walking to Target to look at things. What others called  behavior that needed a
> "behavior plan" that was really about figuring out how to control the client, I
> called it an expression of frustration and anger.

(Exhibit C.)

Douglas' life improved dramatically. He had a daily routine that improved his mood. His

tantrums lessened, as did his need for supervision. One day, when Anita, Gerri and Ms. Abboud

were visiting Douglas at his group home, Douglas came up to Ms. Abboud and hugged and

kissed her. Ms. Abboud writes:

> Gerri and Anita were stunned. You couldn't touch Douglas. He was
> profoundly autistic, he met every criteria from the book.

Gerri Zatlow recounts this incident as follows:

> One day, when Wafa, my mother and I were standing at the base of the driveway
> of [Douglas'] group home, my brother came running out and ran in our direction.
> Always affectionate with his family, I expected him to give me or my mom a kiss.
> Instead he ran to Wafa threw his arms around her and gave her a genuine hug and
> kiss. While Douglas is language limited, he is smart and acutely aware of those
> who care about him. He saw her implementing changes, which included
> demanding staff give him the respect and space to do what he wanted in the
> confines of his own home.

(Exhibit D.)

Because of Ms. Abboud's relationship with Douglas, and the family's trust in him, they

decided to make her Douglas' standby guardian and standby executor; a role she maintains.

About this decision, Gerri Zatlow writes:

> My mother was always concerned about the possibility that if neither of us were
> around, Douglas would need a staunch defender.  We agreed that Wafa would
> serve as a Standby Guardian and Executor on our wills if I should pre-decease

September 30, 2021
Honorable Edward R. Korman
Page 20 of 56

> Douglas.   After my mother passed away, I was comforted by the notion that
> Wafa was going to remain a part of my brother's life.

(Exhibit D.)

At Special Citizens, Ms. Abboud started as a service coordinator, earning $35,000/year, a step up from AMAC, where she was had been making $25,000/year. Ms. Abboud also took a second, part-time position with Marantha Human Services, an organization that "provides assistance to people with disabilities, support to families in need, and care to anyone who could use a helping hand through a system of community services."[10] At Marantha, Ms. Abboud worked as a coordinator for the organization's community habilitation program. Ms. Abboud worked 40 hours a week with Special Citizens, and 20 hours a week, on evenings and weekends, with Marantha.

Over 11 years at Special Citizens, Ms. Abboud rose to the position of director of residential services. Ms. Abboud writes that when started, the program service revenue was approximately 3 million. The earliest 990 form for the organization that is available online is from the fiscal year that began in July of 2000 and ended in June 2001. (See Cover Page for 2000 990 for Special Citizens, attached as Exhibit E.) During that period, the program service revenue was $3,446,079. When Ms. Abboud left, in 2010, the program service revenue was $11,921,653. (See Cover Page for 2010 990 for Special Citizens, attached as Exhibit F.) Ms. Abboud writes:

> During that time, I had worked hard to grow the agency and increase our capacity
> to provide services to families in need, opening habilitation, residential, and case
> management programs to serve this population. It involved understanding the
> services, meeting the individual eligibility of services, and documentation of the
> claims, submitting to proper places in New York State to get funds, hiring staff,
> and building a system that can support that can support operations. But, I also

---

[10] From Marantha Human Services website: https://www.maranathahs.org/

September 30, 2021
Honorable Edward R. Korman
Page 21 of 56

recognized the more you can grow the more you can fall apart. You need
infrastructure that builds at the same time.

(Exhibit C.)

Toward the end of her tenure with Special Citizens, Ms. Abboud left her full time

position with the agency and continued part-time as a consultant. Her part-time job at Maranatha

had become a full-time position. She writes:

By the end of 1999, I was Director of Residential Habilitation with Maranatha, and
I was earning $60,000 with compensation for car and gas. I had started as part-time
and I became full-time, working 35 to 40 hours a week. Then, I would work an
additional 15 to 20 hours a week with Special Citizens. So, I was working 60 to 70
hours a week.

(Exhibit C.)

In her letter, Gerri Zatlow acknowledges that during the time they worked together, Ms.

Abboud was always working more than one job. She writes:

Wafa always had more than one job at a time. Her husband did not work and her
growing family necessitated more than one income. She was careful to schedule
part-time work so that it would not conflict with her full-time
responsibilities. What I came to realize over time was that the person who bore
the most responsibility for her family was Wafa. All too often she received phone
calls from her children asking what they would eat for dinner. Their father was
neither available nor willing to pitch in choosing to go to the gym rather than deal
with caring for his kids.  Wafa had to zoom home late from work to shop and
cook or bring food home. Sadly, I saw firsthand that the weight of home life was
on her shoulders entirely. In all the years I worked with Wafa, this never
changed.

(Exhibit D.)

**Starting Human First**

In 2001, one of the parents of Ms. Abboud's clients from AMAC encouraged her to start

her own agency. Ms. Abboud started Human First with five clients, providing community

September 30, 2021
Honorable Edward R. Korman
Page 22 of 56

habilitation in Brooklyn. This involved sending services to a client's home to provide training

and recreational services, to help them function in the community.

One of Ms. Abboud's first clients at Human First was the son of Sharon Jones, a former

Human First Board member who testified at Ms. Abboud's trial. As Ms. Jones testified, she met

Ms. Abboud through Maranatha Human Services, where her autistic son was receiving services.

(TT, p. 234.)  When Ms. Jones met Ms. Abboud, her son was 11 years old. At Maranatha, Ms.

Abboud became his case manager and "helped … a great deal…making sure all his needs were

met educationally, at home, things like that. Like an overall social worker kind of capacity."

(TT, pp. 234-235.) When Ms. Jones found out Ms. Abboud was leaving Maranatha and starting

her own agency, she decided she would leave with her because she was "so impressed with how

[Ms. Abboud] was handling things" for her son. (TT, p. 236.)

At the time, Ms. Abboud was working full-time at Maranatha[11], consulting for Special

Citizens, and running Human First out of the basement of her Valley Stream home. She writes:

> I started to work on Human First on the weekends, along with laundry, food
> shopping. I was working so many hours, I used to take an exit just outside the
> Bronx, park the car, and take a nap for 15 to 20 mins. When I got home, I did the
> cooking, I took the kids to school, and I would go to work, from one work to
> another. I have to admit, I also enjoyed that crazy life. I focused on
> work and I was able to succeed. It was unexpected success. It was shocking to
> everyone around me to see how far I had come. I just wanted to do the work, and
> support my children.

(Exhibit C.)

---

[11] Ms. Abboud left Maranatha in approximately 2003, giving more time to Special Citizens. In
approximately 2006 or 2007, Ms. Abboud increased her commitment to Special Citizens at a
consultant. In 2009 and 2010, Ms. Abboud also helped her sister Fatma at EIHAB Human
Services (https://www.eihab.org/)  where Fatma was the CEO, when the agency was in the
middle of an audit.

September 30, 2021
Honorable Edward R. Korman
Page 23 of 56

Reda Soliman, who was not working, and had still not passed his medical board

examinations, insisted on being the CEO of Human First. Ms. Abboud took the title of COO, but

in reality, she did everything. She writes: "He never got involved and I did both our

jobs." (Exhibit C.)

**Ms. Abboud's Conversion to Christianity**

Ms. Abboud, who grew up Muslim, was introduced to Christianity in 2003. She was

looking for office space for Human First, and found a room for a rent in a church. She and the

pastor started talking about religion. Listening to the pastor speak, Ms. Abboud, who has always

been an anxious person, felt a sense of peace that was new to her. The Christian notions of love

and compassion and forgiveness touched her deeply. Ms. Abboud invited the pastor to visit her

and her husband at their home. The pastor visited over twenty times, teaching them the tenets of

Christianity.

The decision to leave Islam was difficult and fraught for Ms. Abboud, an abandonment of

the belief system in which she was raised. But ultimately, she knew that she had to follow her

heart. Mr. Soliman also became a Christian, and the two were baptized together.   Christianity

had a positive effect on Mr. Soliman. For a time, the abuse ended. Mr. Soliman rededicated

himself to his studies and he finally passed the medical boards. In May of 2005, ▮▮▮▮▮

Soliman was born, and Ms. Abboud finally believed her life – and her marriage – were on the

right track.

**Building Human First While Living in Fear and Pain**

Unfortunately, this "honeymoon period" in her marriage did not last. In 2006, Mr.

Soliman applied for medical residencies, and was not offered a single position. In 2007, Ms.

September 30, 2021
Honorable Edward R. Korman
Page 24 of 56

Abboud suggested that Human First start a medical clinic – VersaCare[12] – that Mr. Soliman would run. The idea was a clinic that would offer medical and dental care for people with disabilities.

Around 2009, the abuse started again. Ms. Abboud was helping Mr. Soliman start the clinic, and he felt that she was getting too involved with "his business." Someone would call Ms. Abboud to ask her questions about Versa Care and Ms. Abboud would direct the caller to Soliman, but the fact of the call alone would cause Mr. Soliman to erupt. Ms. Abboud recalls long, drawn out arguments, during which Mr. Soliman abused her verbally. Ms. Abboud did what she always did when her home life felt chaotic and overwhelming – she buried herself in a safe place – her work. But work was not enough to save her. Mr. Soliman belittled everything about her, questioned her work and sleeping habits, even her need to drink coffee in the morning, telling her that her behavior was abnormal, making her feel crazy.  Ms. Abboud would drive around at night to stay away from her husband and preserve her sanity. On several occasions, she spent the night in her car.

On several occasions, Ms. Abboud caught Mr.Soliman going through her bedroom closet and work bag. Ms. Abboud would find paperwork missing, and wondered if Mr. Soliman was deliberately trying to sabotage her. At Ms. Abboud's trial, Sharon Jones recalled that at some point, Mr. Soliman had attempted to get into Ms. Abbboud's work calendar, so that he could see her schedule, and that the Board sent him an email confronting him about this behavior. (TT, pp. 296-297.)

---

[12] Versacare was finally certified in 2013. It failed two years later, in 2015.

September 30, 2021
Honorable Edward R. Korman
Page 25 of 56

In her letter, Gerri Zatlow remarks that Ms. Abboud kept the horrors of her home life

"hidden from all of us." She recalls one occasion, after not hearing from Ms. Abboud, where she

called her at home, only to get the following glimpse into her home life:

> One day after a long silence I was worried about Wafa and called her at home.
> Her husband picked up the phone and told me that she was not available to speak
> to anyone. In the background I could hear Wafa sobbing as if her heart was
> broken. It is a sound I can never forget as it showed the depths of Wafa's misery
> living with a tyrant. She protected her children from his taunts and terror and kept
> those of who cared about her away from this ugly view.

(Exhibit D.)

Unlike Gerri Zatlow, Tharwat Ahmed, a friend to both Ms. Abboud and her ex-

husband for over two decades, was a first-hand witness to the abuse Wafa suffered over

many years. He writes:

> During Wafa's marriage, my wife and I saw how abusive her husband was, both
> mentally and physically. I remember one occasion where if I had not been there to
> physically stand in his way, I am sure he would have battered her. Other times, we
> saw bruises. And we heard him demean and belittle her. My wife and I had been
> married longer, and we tried to advise them, to see if we could help the marriage,
> but it was not a situation that could be helped. My relationship with Wafa's
> husband ended because he believed my wife and I were on Wafa's side. He was
> not wrong; Wafa built everything for their family, and he abused her and treated
> her with disrespect. I am sorry I called him "friend" for as long as I did.

(*See* Letter from Tharwat Ahmed, attached as Exhibit G.)

And in her letter to the Court, Ms. Abboud's 23-year-old daughter, Yasmine Soliman,

writes of the abuse she witnessed as a child:

> For years I watched my mother endure a tumultuous, abusive relationship with
> my father. Many times fights would result in police involvement, my mother
> leaving our house to avoid further conflict, and emotional trauma for me and my
> siblings as we had to hear and see these altercations. After years of living in an
> environment that was emotionally and physically hostile, my mother did not
> abandon us or give up on herself. She pushed forward to provide for us and be
> able to move forward from that 15-year stage of our lives.

September 30, 2021
Honorable Edward R. Korman
Page 26 of 56

(Letter from Yasmine Soliman, attached as Exhibit H.)

In June or July of 2009, Ms. Abboud had a pain in her chest and went to the hospital, certain she was having a heart attack. What she was experiencing was, in fact, a panic attack. She began seeing Dr. Sohail Cheema, a psychiatrist in Westbury, New York. Dr. Cheema diagnosed Ms. Abboud with Major Depressive Disorder and Anxiety; she was prescribed 300 milligrams of Wellbutrin (for depression) and .5 milligrams of Xanax (for anxiety).[13]

In 2010, Ms. Abboud wrapped up her other commitments[14] and focused exclusively on Human First. In her trial testimony, Ms. Jones testified that Ms. Abboud was very good at her job. (TT, p. 295.) She described Ms. Abboud as a "very hands-on CEO," describing her responsibilities as follows:

> She had a lot of responsibility. She ran the agency. She made sure all the -- she did everything. She was responsible for advocating for the agency, for -- she would be in Albany all the time. She would -- when other agencies were in trouble, she would see about seeing if we could help them out. Several -- we took over some agencies that weren't in good shape. She oversaw properties that were set up for residences for the disabled, where they would live.

(TT, p. 241.)

Under Ms. Abboud's stewardship, Human First grew by leaps and bounds. At Ms. Abboud's trial, Moataz Ramadan testified about the growth of the organization during his tenure there, from approximately $12 million in yearly revenue in 2012, to approximately $20 million in 2016, an increase he attributed to the agency's expansion into residential programs. Mr. Ramadan's testimony underestimated the organization's growth.  In 2001, the year Ms. Abboud

---

[13] Ms. Abboud stopped meeting with Dr. Cheema in July of 2016 because her health insurance stopped when she was terminated by Human First.

[14] At the time, Ms. Abboud was still consulting for both Special Citizens and Eihab. She terminated both contracts so she could help Human First grow.

September 30, 2021
Honorable Edward R. Korman
Page 27 of 56

started the agency with five clients from her kitchen table, the annual program service revenue

was $53,346. (*See* Cover Page for 2001 990 for Human First, attached as Exhibit I.) In 2012, the

year Mr. Ramadan started, the program service revenue was $7,115,831. (See Cover Page for

2012 990 for Human First, attached as Exhibit J.)  And during the fiscal year ending in June

2016, the program service revenue was $22,799,501. (*See* Cover Page for 2016 990 for Human

First, attached as Exhibit J-2.)

For your Honor's consideration, counsel has created the below chart of the organization's

growth from 2001-2016, based on publicly available 990 Forms.



In approximately 2011, Human First began the process of being certified as a "Compass"

agency. According to the website for the Office for People With Developmental Disabilities,

September 30, 2021
Honorable Edward R. Korman
Page 28 of 56

> The Compass designation is achieved by provider agencies which have demonstrated the ability to consistently provide quality supports and services that exceed minimal regulatory requirements.

> This program was designed in the 1990s by OPWDD and agencies that demonstrated dependable focus on person-centered processes, which resulted in high levels of both health and safety compliance and valued outcomes.[15]

OPWDD certifies more than 7,500 sites and programs (operated by more than 500 non-profit and state providers). Currently, only four of those providers are certified as "Compass" agencies.[16] Ms. Abboud strove to have Human First recognized in this way. The agency had a good reputation at OPWDD, and was often called upon to merge with smaller, failing agencies.[17]

At the close of 2015, OPWDD completed a "Statewide Summary Report" after reviewing Human First's performance between January 15, 2015 and December 18, 2015. Human First received high compliance ratings in both "person-centered review" and "site review" categories. With respect to OPWDD's site review of five different Human First sites, Human first scored 100% compliance in 11 out of 12 categories, far exceeding statewide averages. (See OPWDD Statewide Summary Report for 2015, attached as Exhibit K.)

Since Ms. Abboud's arrest, the agency's growth appears to have plateaued. In 2017, program service revenue was $22,330,484. In 2018, program service revenue was $21,288,137. There are no publicly available filings for 2019 or 2020. The website for the organization states that over 400 staff-members currently serve over 1400 families across New York City, Nassau, and Suffolk counties.[18]

---

[15] *See* https://opwdd.ny.gov/providers/compass
[16] *See* https://opwdd.ny.gov/providers/provider-stability-and-performance
[17] As of this writing, Human First has yet to be recognized as a Compass agency.
[18] See http://www.humanfirst.org/

September 30, 2021
Honorable Edward R. Korman
Page 29 of 56

**The Dissolution of Ms. Abboud's Marriage**

Throughout her marriage, Ms. Abboud worked constantly and was the sole caretaker for her children. She writes: "I didn't know it, but I was on the edge of a breakdown. I wanted to run away from me, I wanted to work because it was the only thing that was right and it was working. It was my way to survive mentally." (Exhibit C.)

In 2010, Ms. Abboud hired a private investigator and discovered her husband was having an affair. This knowledge gave her the courage to file for a divorce. Mr. Soliman moved out, but he still came to work at Human First, starting fights with Ms. Abboud at work and making her life at work as miserable as it had been at home. In October or November of 2010, the Board of Human First fired Mr. Soliman. At Ms. Abboud's trial, Sharon Jones testified that the circumstances of Mr. Soliman leaving Human First were "unpleasant," that he and Ms. Abboud were breaking up personally, that "he had to leave," and that he was given a "generous" severance package. (TT, p. 240.) Ms. Jones acknowledged that Mr. Soliman was not good at his job, that he was lazy, that he could be abusive to staff, and agreed that he didn't add much to the organization. (TT, pp. 295-296.)

In order to remove Mr. Soliman from Human First, the Board devised an exit strategy in which he and Ms. Abboud would be co-CEOs of Human First until six months after VersaCare was licensed to open, after which Mr. Soliman would leave Human First. (TT, pp. 298-299.) In order to facilitate Mr. Soliman's exit, Ms. Jones testified that Ms. Abboud voluntarily agreed to a reduction of her salary, which the Board appreciated. (TT, p. 299.)

Ms. Abboud and Mr. Soliman briefly reconciled in December of 2010. Mr. Soliman came home and told Ms. Abboud that their marital problems stemmed from their working too closely

September 30, 2021
Honorable Edward R. Korman
Page 30 of 56

together. Now that he was no longer working at Human First, Mr. Soliman persuaded her that

they could finally work on their relationship. In January of 2011, Ms. Abboud became the CEO

of Human First and VersaCare was officially severed from Human First.

Unfortunately, the relationship between Ms. Abboud and Mr. Soliman did not improve,

and the psychological abuse continued as it had before. Mr. Soliman was preparing to open

VersaCare, but was unable to get the clinic on its feet. He blamed Ms. Abboud for his setbacks

and failures. In June 2011, Ms. Abboud filed for divorce again. The relationship continued to

deteriorate; in the end, she lived in fear with Mr. Soliman, who looked at her with contempt and

hatred.

After filing for divorce, Ms. Abboud began seeing a therapist to help her cope with the

acrimony with her husband and the stress and emotional pain of the process.  A licensed social

worker recommended by the law guardian representing her children in the divorce helped Ms.

Abboud understand that her husband exhibited the classic behaviors of a narcissistic sociopath.

Charismatic and charming, unreliable, controlling, selfish, and dishonest, Mr. Soliman felt

entitled to abuse Ms. Abboud, and then to deny responsibility for his actions. He  lacked

empathy, emotional responsiveness, and insight into his behavior. Ms. Abboud could not change

him, but she finally understood that she – and her children – deserved better, and found the

strength in herself to move forward.

Over the next year, Ms. Abboud and Mr. Soliman continued to live in the same house.

Ms. Abboud wanted to leave and take the children with her, but her lawyer told her that she

could not take the children from the family home and she had no ability to force Mr. Soliman to

leave. Ms. Abboud's son, ██████, was six years old. Noreen was 14 and Yasmine was 12. Ms.

September 30, 2021
Honorable Edward R. Korman
Page 31 of 56

Abboud knew that she was all they had. She had to stay there, living in the house with Mr.

Soliman, in order to protect her children.

On January 16, 2012, the police were called when Mr. Soliman pushed Ms. Abboud

during an argument. Scared that the situation would escalate if Mr. Soliman was arrested, Ms.

Abboud did not press charges and asked the police not to arrest him. (*See* Exhibit L, Domestic

Incident Report from January 16, 2012.)

In early June of 2012, Ms. Abboud was resting on the couch in the family room. Noreen

and Yasmine had already gone to school, and ███ was still sleeping. Mr. Soliman entered

the family room and approached the couch. Ms. Abboud sat up and said "What do you want?"

Mr. Soliman slapped her across the left side of her face and ear, and said "I'm going to show

you, bitch!" Ms. Abboud sat on the couch in a daze, unable to move. She checked the time and

saw that her son, who was still sleeping, was going to be late to school. She woke him and

helped him get ready and drove him to school, still in her pajamas. When she got back home, she

showered and started getting ready for work. Ms. Abboud's left ear was ringing and her face and

jaw was throbbing When she looked at herself in the mirror, she saw a bruise in the shape of an

open hand across her cheek. Ms. Abboud went to court and got a six-month temporary order of

protection. Mr. Soliman was arrested for assault, and required to leave the family home. (*See*

Exhibit M, Temporary Order of Protection from June 4, 2012.) A contemporaneous doctor's note

lists hearing loss, tinnitus, pain and abrasions on the left side of her face "secondary to assault."

(*See* Exhibit N, Doctor's Note from June 4, 2012.)  On October 17, 2012, Mr. Soliman received

an ACD (Adjournment in Contemplation of Dismissal) for his assault on Ms. Abboud, leading to

a dismissal of the charges if he did not commit another offense within six months. (*See* Exhibit

O, Soliman ACD from October 27, 2012.)

September 30, 2021
Honorable Edward R. Korman
Page 32 of 56

Ms. Abboud's divorce was finalized through a joint stipulation of settlement on November 20, 2012. She and Mr. Soliman agreed to share joint legal custody of the children. Per the agreement, Noreen and Yasmine would live with their father, and ███████ would live with Ms. Abboud. Ms. Abboud did not want to live apart from her daughters, but supported her daughter's decision. Mr. Soliman had turned Noreeen and Yasmine against her, making them believe that he was the victim and the divorce was Ms. Abboud's fault. On November 30, 2012, the court issued a final order of protection requiring Mr. Soliman to stay away from Ms. Abboud's home, school, place of business, and person for one year. (*See* Exhibit P, Final Order of Protection from November 30, 2012.)

**Ms. Abboud's Children**

A few months after the divorce, and approximately eight to ten months after they went to live with Mr. Soliman, Mr. Soliman brought Noreen and Yasmine back to Ms. Abboud. As all three children were living with Ms. Abboud, Mr. Soliman was supposed to pay child support, per the parties' agreement. He refused. Mr. Soliman also agreed to split the cost of summer camp and college tuition, which he also refused to pay.

From Ms. Abboud's perspective, Mr. Soliman's love for his children is conditional. For a time, he tried to use his daughters to get to Ms. Abboud. When that did not work, he verbally abused them, telling them that they were worthless like their mother. His only interest in them was tied to his ability to use them to get what he wanted. Mr. Soliman has shown occasional interest in his son, ███████, inviting him to spend time with him. These visits have always been detrimental to ███████. Ms. Abboud writes: "Whenever he has gone to see his father, my son has come back upset because his father tears him down psychologically like he did with me." (Exhibit C.)

September 30, 2021
Honorable Edward R. Korman
Page 33 of 56

After the divorce, Ms. Abboud's children confided that Mr. Soliman would hit them

when she was not there. Ms. Abboud writes:

> My ex-husband only hit the children once in front of me. He hit my daughter
> Yasmine, and I lost it. He never did that again in my presence. But, after the
> divorce, my kids finally talked about it and told me that he would hit them when I
> was not there. They didn't tell me sooner because it would mean a confrontation
> between us and they were afraid they would suffer the consequences especially
> since I was working so much and often out of the case.

(Exhibit C.)

After Noreen and Yasmine moved back in with Ms. Abboud, Mr. Soliman essentially cut

the children out of his life. As of this writing, Mr. Soliman sees the children sporadically and at

his convenience. As Yasmine writes in her letter to your Honor,

> After my parents divorce my father has become extremely unreliable. There was a
> year-long period where he would not answer a phone call, and we had no idea
> where he was or how to contact him. In the years since he has given minimal to
> no financial support, with even requests for $200 dollars once every couple
> months rejected as an option. It is always uncertain if he will be able to financially
> support us at any given time, regardless of the necessity of the money.

(Exhibit H.)

In the Fall of 2013, Noreen started attending New York University as an undergraduate.

In violation of the divorce settlement, Mr. Soliman refused to be a co-signer on Noreen's school

loans, in violation of the divorce settlement agreement, requiring Ms. Abboud to take full

responsibility. Yasmeen started college in the Fall of 2016, and again, Ms. Abboud took full

responsibility for co-signing her loans. In 2017, 2018, and 2019, Ms. Abboud, who had no

income and poor credit,  needed a guarantor for the loans, and asked her friend, Tharwat Ahmed,

who agreed to co-sign loans for the girl's schooling. Ms. Abboud has since consolidated the

loans under her own name, removing Mr. Ahmed as a co-signer. She owes over $620,000 for her

daughters' education, a responsibility she now shoulders on her own.

September 30, 2021
Honorable Edward R. Korman
Page 34 of 56

After Ms. Abboud's arrest, in a moment of desperation, Ms. Abboud asked Mr. Soliman

if he would take their children if she was sentenced to a term of imprisonment.[19] Mr. Soliman

responded he would only take their son █████, and send their daughters to Egypt to live as he

had no room for them. Ms. Abboud's daughters, ages 17 and 20 at the time of her arrest, were

born and raised in the United States, and wanted to stay close to their mother, in the only country

they have ever known. Given the physical and psychological abuse he has visited on them in the

past, Ms. Abboud also recognizes that Mr. Soliman is not a suitable caretaker.

**Ms. Abboud's Federal Arrest**

Ms. Abboud was fired from Human First in May of 2016. On June 15, 2016, she was

arrested in connection with the charged offense.

As mentioned above, given that Ms. Abboud contests her conviction, this letter does not

address offense conduct, acceptance of responsibility, remorse, insight into criminal behavior, or

any topic common to a traditional sentencing submission that could be read to further inculpate

Ms. Abboud.

**Ms. Abboud's State Sentence**

Ms. Abboud was sentenced to six months on state charges after a conviction for criminal

tax fraud related to the federal case. Her sentence included $35,450 in restitution, and $375 in

court fees. She was sentenced and imprisoned on September 5, 2019. When she was in jail, Ms.

Abboud was always thinking about her children. ███████ was 14 years old and was living with

---

[19] Beyond her ex-husband, Ms. Abboud has no family in the United States who could take the
children.  Ms. Abboud's sister, Fatma Abboud, died from pancreatic cancer in 2015; her three
living siblings reside in Egypt.

September 30, 2021
Honorable Edward R. Korman
Page 35 of 56

Noreen, who was 23 years old, in the family home. Noreen, who suffers from a neurological

condition that causes dizziness, tremors, and blackouts, could not care for ███████ on her own.

Yasmine, who was 21 years old at the time, had a room in an apartment near NYU, where she

was in her last year of college, but was forced to move home to help care for ███████. She

writes:

> When my mother went to jail for 3 months, I tried to turn to my dad for support
> and he was unwilling to make any significant changes to help me and my siblings
> navigate a difficult time. As my dad was unwilling to drive our teenage brother 30
> minutes to school, I moved back to Long Island so he could continue to go to the
> same high school and not be more disturbed during a turbulent time. While
> maintaining full time student status at NYU and attending all my classes, I also
> held 3 jobs simultaneously as an accounting aid at a PR firm, research assistant
> and teaching assistant. I was waking up at 6 am daily to get my brother to school
> and commute into the city, and sleeping at 3am every night to make sure day to
> day errands such as laundry were accomplished along with my homework or
> studying. It was a grueling time for me and my sister, as we tried to maintain a
> sense of normal for our 15 year older brother, manage the newfound financial
> stress, and find time to continue on our normal trajectories at school and work.

(Exhibit H.)

     While this was a time of intense struggle and sacrifice for all of Ms. Abboud's

children, Yasmine notes that it also gave her a sense of her mother's impact on her

friends and neighbors, as a number of the people Ms. Abboud has helped over the years

stepped up to help her children. Yasmine writes:

> During this time the biggest support came from my mom's friends, both new and
> lifelong. Women from our church that my mother has become very close to
> showed up every week to bring us food when we didn't have time to cook,
> groceries when we didn't have time to shop, and offer any support we needed.
> Family friends reached out, some having known my mom for over 20 years,
> offering both financial support and moral support. All of these people reached out
> without even being asked, all citing times my mom has been supportive of them
> and how important she has been in their lives. Once again I was reminded of the
> special impact my mom had on everyone around her and I missed her even more.

(Exhibit H.)

September 30, 2021
Honorable Edward R. Korman
Page 36 of 56

The experience of being locked up and not being able to care for her children filled Ms.

Abboud with anguish. After three months of incarceration, she was released on bail pending

appeal on November 27, 2019. On March 3, 2021, the judgment was affirmed by the Second

Judicial Department of the Appellate Division. Ms. Abboud applied for leave to appeal to the

Court of Appeals, which was denied. She returned to jail on May 20, 2021, serving an additional

month incarcerated before her release on June 17, 2021.

**Ms. Abboud's Present Circumstances**

As of this writing, Ms. Abboud's son ███ is 16 years old. Her daughters, Yasmine

and Noreen, are 23 and 25. ███ is an honor student in the 11th grade, and one of 27 high

school students selected to participate in scientific research in a partnership between his high

school and SUNY Stonybrook. Two days a week, Ms. Abboud drives ███ back and forth to

a research lab in Stonybrook, where he is participating in a research project about how plastic

impacts underwater ecosystems.

███ lives with his mother in the Merrick Avenue home that is the subject property in

the mortgage fraud conspiracy for which Ms. Abboud was convicted. The property belongs to

the bank, which plans to sell it at a foreclosure auction, a process that has been temporarily

stalled by COVID-19-related court closures. Recently, Noreen and Yasmine moved to Brooklyn

together to be closer to their jobs. Noreen works for a French jewelry company and Yasmine

works for an accounting firm.

Prior to the onset of COVID-19 pandemic, Ms. Abboud tirelessly sought employment,

hoping to fulfill her responsibility to provide for children. In 2018, Ms. Abboud began

volunteering with her church at a social day program for seniors. In April of 2019, she was hired

September 30, 2021
Honorable Edward R. Korman
Page 37 of 56

for one month to help the church apply for funding for the program and create policies and

procedures. She also found other part-time work, including a part-time position as an

administrative assistant for a contractor.

Since Ms. Abboud's release from state custody on November 27, 2019, she has not been

successful in securing steady employment. The onset of the COVID-19 pandemic has further

frustrated her job search. As she writes in her letter to Your Honor, Ms. Abboud has supported

herself through financial assistance from her church and friends. Her children's small incomes

have been used to pay for family expenses. In July of 2020, Ms. Abboud applied for temporary

assistance for herself and her son, █████. She was approved in September of 2020, and

currently receives $450 in public assistance and $355 in SNAP benefits monthly.  (*See* Exhibit

Q, Public Assistance Letter.)

Ms. Abboud would like to help the bank find a buyer for her home. She writes "I am

actively trying to find a buyer so that the property will command the highest sale price possible

to fulfill my obligations." (Exhibit C.) After the onset of the COVID-19 Pandemic in March of

2020, Ms. Abboud's young adult children paid to finish the brickwork on the front of the house

and repair the broken front steps to make it more attractive for sale.  Ms. Abboud worries about

her childrens' futures. She writes:

> Their futures are precarious and when I think about them trying to navigate it with
> me behind bars unable to help them, I can't breathe.  Being in state jail was the
> worst experience of my life. I thought about my children every minute. I felt like
> the biggest failure. Not being able to care for them, knowing that my
> imprisonment made their lives worse.

(Exhibit C.)

September 30, 2021
Honorable Edward R. Korman
Page 38 of 56

Yasmine, too, worries about impact her mother's impending re-incarceration will have on

her live, and the lives of her siblings. Reflecting on her experience of Ms. Abboud's state

sentence, Yasmine writes:

> During the time when she was away it was also a large wake up call how crucial
> my mom's role in all our lives are. In order to maintain any stability for my
> brother as he completes highschool, without the support of my mom it's clear the
> burden will once again fall onto my own shoulders. As a sister I know no matter
> what I can't replace the role my mom plays in his life, but I also now know it's
> extremely hard for just me and my sister to manage even the basic day to day
> responsibilities and financial burdens. There's really no words that can truly
> encapsulate the necessity she has in our lives. When thinking about a reality
> without her, it is disastrous, unfathomable, and heartbreaking. Remembering that
> time, and the relief I felt when she was able to come home, makes me feel very
> emotional and sad but also grateful that I have a mother that adds value and
> support to our family.

(Exhibit H.)

Ms. Abboud continues to look employment. She longs to be off of public assistance, to

have money to contribute to the well-being of her children, and to pay back the friends and

family who have given her money during these desperate times. She is mindful of what she has

lost, and how far she has fallen. She hopes to be able to find a job that gives her some measure of

dignity where she can help improve the lives of others. She writes:

> I miss being productive and am eager to find a job that will allow me to be of
> service. But, this time around, I vow that I will have balance in my life. I will not
> stay in the office until 10 p.m. and 11 p.m., and then go home and do emails until
> 3 a.m. and wake up for work three hours later. When I was running Human First, I
> didn't have any help, I did three people's job. I see now that I was using work as a
> means to avoid the abuse I suffered at my ex-husband's hands. I was in a lot of
> denial. I have suffered from depression and anxiety for years that has caused me
> distraction and confusion. I have walked with every burden, to keep moving on,
> and I didn't get help when I needed it. If my head was in the right place, I would
> probably have rearranged my life much sooner.

(Exhibit C.)

September 30, 2021
Honorable Edward R. Korman
Page 39 of 56

In recent months, Ms. Abboud has begun volunteering with The Fortune Society, an organization that supports reentry from incarceration, and The Women's Opportunity Rehabiliation Center,  a community correction program that offers alternative to incarceration programs for female offenders in and around Nassau County. For these organizations, Ms. Abboud's conviction – and experience as a recently incarcerated person – is an asset, making her a more effective advocate for the populations that they serve. Ms. Abboud is deeply proud of this work, which has enabled her to continue to be of service to the community.

At age 53, with a felony conviction, and substantial debt, both from the state court judgment, and whatever financial penalty this Court may impose, Ms. Abboud faces substantial challenges. While the sale of her home at a foreclosure auction has been temporarily halted by COVID-19, soon, she and her children will have to find a new place to live. Ms. Abboud credits her religious faith, and the religious community of which she is a part, with helping her find the strength to move forward, and the hope for a brighter future.

**Ms. Abboud's Medical Issues[20]**

Ms. Abboud suffers from a number of unresolved medical issues. For over four years, from 2016, when she was fired from Health First, until September of 2020, when she qualified for Medicaid, Ms. Abboud was without health insurance and as such, was unable to seek treatment. Since qualifying for Medicaid in September of 2020, she has begun getting her medical needs addressed.

 As we wrote in our letter to the Court of July 7, 2021, Ms. Abboud has infections in her abdomen stemming from drainage issues from several prior surgeries: a 2005 abdominal surgery

---

[20] Ms. Abboud's medical records are not attached, for privacy reasons. However, these records are available upon request.

September 30, 2021
Honorable Edward R. Korman
Page 40 of 56

which resulted in longstanding abdominal pain; a 2012 surgery to correct a prolapsed uterus,

which further aggravated the abdominal pain; and unsuccessful corrective surgery from 2015. In

May of 2021, Ms. Abboud's gastroenterologist, Dr. Ayanna Lewis, referred her to a surgeon due

to continuing pain and abdominal discharge. The surgeon determined that the best course of

action was surgery to clean the area to remove old sutures and remediate infection in the area.

Ms. Abboud was hoping to have this surgery over the Summer, and we adjourned the sentence to

make this possible; however, she has been unable to find a surgeon who will accept Medicaid to

perform the surgery. The pain and discharge continues, and the infections remain unresolved.

Ms. Abboud also has a .6 cm mass in her left breast. The mass was first identified in a

mammogram on December 26, 2020. A subsequent mammogram and ultrasound, conducted on

August 25, 2021 showed an abnormality that requires a biopsy. The biopsy is currently

scheduled for October 18, 2021.

Further, Ms. Abboud suffers from Hypothyroidism due to Hashimoto's Thyroiditis,  an

autoimmune disorder in which the body produces antibodies that cause the thyroid to become

inflamed and damaged. In Ms. Abboud's case, the damage to her thyroid has caused it to stop

producing thyroid hormone. Currently, Ms. Abboud's condition is treated with hormone

replacement therapy, although this condition requires yearly monitoring to determine whether

surgery is indicated. On August 8, 2021, Ms. Abboud had a thyroid ultrasound, which found two

nodules. Ms. Abboud's Endocrinologist, Dr. Sandra Jaimungal, has recommended a biopsy to

determine whether the nodules are cancerous. This biopsy is in the process of being scheduled.

September 30, 2021
Honorable Edward R. Korman
Page 41 of 56

Finally, Ms. Abboud continues to suffer from depression and post-traumatic stress

disorder related to the domestic abuse she suffered for decades.[21] Ms. Abboud was under the care

of Dr. Sohail Cheema from 2009 until July of 2016, shortly after her arrest in this case. After

discontinuing treatment due to the loss of health insurance, Ms. Abboud discontinued treatment

with Dr. Cheema due to the loss of her health insurance. For a time, she received free treatment

through a referral from Probation, and paid for her medication out-of-pocket. Now that she has

Medicaid, her GP manages her mental health treatment. She is currently prescribed Wellbutrin to

treat her depression.

**Family and Community Support**

Candidly, Ms. Abboud's arrest and conviction on state and federal charges eroded a lot of

community trust and support.  Many people in Ms. Abboud's life have deserted her. The small

group of supporters who have remained at her side are ardent in their support of Ms. Abboud,

and their letters show that Ms. Abboud's commitment to helping others is evident in all aspects

of her life and in all of her relationships.

As detailed above, Gerri Zatlow's letter describes a compassionate advocate who fought

for other people's children, and the only person she trusted to serve as standby guardian for her

brother. (*See* Exhibit D.) Father Tadros describes a dedicated volunteer who helped their elderly

parishioners access needed social services.  (*See* Letter from Father Tadros, attached as Exhibit

R.) Similarly, Joseph Boutros, who has known Ms. Abboud for over 12 years through the

Egyptian community, watched her "helping any and every person who need help sometimes

without request from them" and noticed in her a "unique ability" to feel the pain and suffering of

---

[21] Now that Mr. Soliman is not a part of her life, Ms. Abboud does not find anxiety to be a
problem.

September 30, 2021
Honorable Edward R. Korman
Page 42 of 56

others, and who went out of her way to help regardless of her own personal struggles. (*See* Letter

from Joseph Botros, attached as Exhibit S.)

Tharwat Ahmed writes that "Wafa was the type of person who was always willing to help

and be there for those who needed help, which made our friendship so lasting and valuable."

(Exhibit G.) Mr. Ahmed, who was for a time, the broker for Human First's employee health

insurance, saw firsthand how Ms. Abboud went above and beyond for her employees. He writes:

> Wafa insisted on covering all of the copays and deductibles paid by her
> employees, so they could access healthcare without incurring a personal expense.
> This is highly unusual for employers. Most employers saddle their employees
> with these additional costs.

(*Id*.)

Jihan Habashy, who has known Ms. Abboud for over 10 years, "experienced Ms.

Abboud's endless generosity personally." (*See* Letter from Jihan Habashy, attached as Exhibit

T.) As Ms. Habashy writes in her letter,

> In August, 2018 one day before my departure to Europe, my 82-year-old mother
> was admitted to the hospital. Unfortunately, I couldn't cancel my travel, and I was
> naturally concerned about my mother before I left. I called Wafa asking her to
> check on my mother in the hospital during my time outside of the United States. I
> have to admit; it wasn't easy to ask her since she and my mother barely knew each
> other. However, Wafa assured me she would see my mom on daily basis and
> spend some time with her in the hospital. Wafa promised me she would tend to
> my Mom's personal needs and requests and did so
> lovingly and without hesitation.
>
> It seemed like my mother would be in the hospital until the time I returned since
> they had to run several medical tests on her. However, it didn't work out that way
> and my mother was discharged 4 days before my return. I was in touch with the
> hospital and Ms. Abboud on a daily basis. I was concerned about my mother
> being home alone since she refused to have any help from home care and nursing
> aides. I was the one who generally attended to her needs, but Wafa surprised me
> by taking my mother into her house for the time I was abroad. She cared for her,
> attended to her medication and food restrictions, etc.

September 30, 2021
Honorable Edward R. Korman
Page 43 of 56

> Your Honor, I don't know too many people who would do this, but Wafa is a
> unique, caring person who opens her heart and her home to anyone who needs
> her. She doesn't think twice, she doesn't need to know the person who needs.

(Exhibit T.)

Ms. Habashy's letter is striking in its detail, but the sentiment she expresses is hardly

unique. Caring for others is written into Ms. Abboud's DNA. She is a person who goes above

and beyond for other people.

A common thread in all five of these letters is Ms. Abboud's dedication to her children.

Ms. Abboud's supporters have all observed her as a mother, and know how important her

children are to her. All of them have watched Ms. Abboud work around the clock as full-time

parent and full-time breadwinner. And they understand that a term of incarceration for her is

profound loss for these children, one of whom is still a child, and the other two, young adults in

their early twenties who still live at home and depend on their mother for guidance and support.

Yasmine Soliman is one of the beneficiaries of this dedication. While acknowledging

how much her mother was "constantly working," she writes "I can easily credit my mom as

being a motivator and crucial component to my success. She has really inspired me to be strong,

independent, go after what I want, and also live my life with purpose." (Exhibit H.) She

continues:

> The impact she has on me is also astounding. While managing a career that often
> had her working until after 9pm, I always knew my mom was a phone call away.
> From simple things such as going home early from school because I felt sick, to
> the time I got in a car accident when she was over an hour away, I knew she
> would show up when I needed her. She's been our family's primary caregiver for
> over 9 years now and it's been extremely awe inspiring to watch. She has single
> handedly provided everything we needed and more, without assistance from
> anyone.

(*Id.*)

September 30, 2021
Honorable Edward R. Korman
Page 44 of 56

Finally, Nelly Wisa, an elderly Arabic-speaking Egyptian woman whom Ms. Abboud met at church two years ago (after her arrest in this case), provided a letter that speaks to the support Ms. Abboud has provided her during the course of their short friendship. She writes:

> I am a 73 years old widow, with health issues such as the need to use a walker when walking. My medical problems hinder me from going to the hospital, doctors' offices and fulfilling my needs because I also live alone. Since I met my friend Wafa, she has been going with me to the hospital and seeing my physicians whether general or the specialists whom I see for the purpose of knee and shoulder joints replacement. I needed someone to speak on my behalf and to provide guidance to me because the system is complicated and my English language proficiency is limited. Through Wafa's help I was able to attain the best healthcare that I needed as she handled necessary communication with hospitals and physicians to set appointments for me. I am currently in the last preparatory stage for the knee replacement operation at Manhattan Specialized Hospital. Without her, I could not have located or obtained such medical and health care. Also, she has been going with me to my nutritionist and my physical therapist as well as other places. She also helps me read letters sent to me from hospitals, medical insurance and other locations as well replying to them.

(*See* Letter from Nelly Wisa, attached as Exhibit U.) This letter speaks, fundamentally, to who Ms. Abboud is, and who she has always been: An advocate for people who cannot advocate for themselves. A person whose self-worth is deeply bound to the joy she feels helping other people access the care they need.


## IV.     THE FRAUD GUIDELINES

In this case, Ms. Abboud's  advisory Guidelines range of 63-78 months is driven almost entirely by a 14-point offense level increase for the "infringement amount" totaling more than $550,000.

This range should not guide the Court in determining a just sentence in this case. Rather, as the Second Circuit recently recognized in *United States v. Algahaim*, 842 F.3d 796 (2d Cir.

September 30, 2021
Honorable Edward R. Korman
Page 45 of 56

2016), the fraud guideline's overwhelming focus on the loss amount should lead courts to

consider non-Guidelines sentences. *Id.* at 800.

In considering the weight to be afforded to the Sentencing Guidelines in a particular case,

the Supreme Court recognized that not all guidelines are equal: while some "exemplify the

Commission's exercise of its characteristic institutional role," others do not. *Kimbrough v.*

*United States*, 128 S. Ct. 558, 575 (2007). In cases involving application of Guidelines that "do

not exemplify the Commission's exercise of its characteristic institutional role," it is "not an

abuse of discretion for a district court to conclude when sentencing a particular defendant" that

the application of the guideline "yields a sentence 'greater than necessary' to achieve § 3553(a)'s

purposes even in a mine-run case." *Id.*  In *Rita v. United States*, 551 U.S. 338 (2007), the Court

reasoned that if a particular guideline was originally based on past sentencing practices, and

revised in response to sentencing data and other research, then it seemed fair to assume that the

recommendations truly embodied the statutory goals of §3553(a).  *Id*. at 349.  Conversely, when

a guideline was not developed according to this practice, there was less reason to believe that it

embodied the statutory objectives and deserved deference, even in a mine-run case. *Kimbrough*,

552 U.S. at 109**.**

Section §2B1.1 is one example of a guideline that is not based on historical sentencing

practices or research, but rather is singularly focused on the overall loss amount, which is a poor

measure of culpability.  For this reason, the Second Circuit has invited District Courts to

consider non-Guidelines sentences in fraud cases. *See Algahaim*, 842 F.3d at 800 ("Where the

Commission has assigned a rather low base offense level to a crime and then increased it

significantly by a loss enhancement, that combination of circumstances entitles a sentencing

judge to consider a non-Guidelines sentence."); *United States v. Corsey*, 723 F.3d 366, 379 (2d

September 30, 2021
Honorable Edward R. Korman
Page 46 of 56

Cir. 2013) (Underhill, J., concurring) ("The loss guideline . . . was not developed by the

Sentencing Commission using an empirical approach based on data about past sentencing

practices.  As such, district judges can and should exercise their discretion when deciding

whether or not to follow the sentencing advice that guideline provides."); *see also United States

v. Johnson*, No. 16-CR-457-1 (NGG), 2018 WL 1997975, at *3 (E.D.N.Y. Apr. 27, 2018) ("As

far as this court can tell, the Sentencing Commission's loss-enhancement numbers do not result

from any reasoned determination of how the punishment can best fit the crime, nor any

approximation of the moral seriousness of the crime"); and *United States v. Gupta*, 904 F. Supp.

2d 349 (S.D.N.Y. 2012) (Rakoff, J.) (describing how the fraud Guideline effectively ignores

everything but loss amount and that many of the resulting Guidelines-recommended sentences

are "irrational on their face").

Because, in Judge Underhill's words, the loss guideline is "fundamentally flawed,"

*Corsey*, 723 F.3d at 377, district courts frequently give below-Guidelines sentences in fraud

cases.  Nationally, the median sentence length for a federal fraud is just eight months. See

U.S.S.C. 2020 Sourcebook of Federal Sentencing Statistics, Table 15. In this district, courts

have routinely issued sentences in fraud cases that are far below the advisory

Guidelines sentence.

An evaluation of the United States Sentencing Commission's Sourcebook of Federal

Sentencing Statistics for Fiscal Year 2020 is revealing in this regard. In 2020, 55 defendants

were sentenced for fraud offenses in the Eastern District of New York. *See* U.S. Sentencing

Commission Statistical Information Packet for Fiscal Year 2020, Eastern District of New York at

September 30, 2021
Honorable Edward R. Korman
Page 47 of 56

Table 7.[22]  Excluding cooperators, courts in this district gave below-Guidelines sentences in 54.5

percent of these cases, with 30 out of 55 defendants receiving sentences below the advisory

Guidelines range.[23] This is consistent with national sentencing trends in fraud cases. According

to the U.S. Sentencing Commission's "Quick Facts" on Health Care Fraud Offenses for 2020,

the median loss amount for health care fraud offenses nationwide was almost $1.3 million, and

the average sentence was 30 months. 47.9% received a variance; and of those offenders: 98.7%

received a downward variance, with an average sentence reduction of 53.0%.[24]

The Sentencing Commission's Interactive Data Analyzer allows us to take an even closer

look at recent Eastern District sentencing trends. In fiscal years 2018, 2019 and 2020, the median

sentence length for fraud (counting probation sentences as zero months) in the Eastern District of

New York was just six months and the average sentence length was 18 months. Further, 76.9

percent of offenders received sentences of less than 24 months, with 19 percent of offenders

receiving sentences of 24 to 59 months, 3.3% of offenders receiving sentences of 60 to 119

months, and 0.8% of offenders receiving sentences of 120 months or more. (*See* Exhibit V,

screenshots from Sentencing Commission Data Analyzer.)

When the data is restricted to defendants in criminal history category I for the same time

period, the median sentence length for fraud was five months and the average sentence length

was 14 months. Further, 82.4 percent of offenders received sentences of less than 24 months,

with 14.2 percent of offenders receiving sentences of 24 to 59 months, 2.9% of offenders

---

[22]   Available   at   https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2020/nye20.pdf

[23]   *See Id*. at Table 10.

[24]   Available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2019/nye19.pdf

September 30, 2021
Honorable Edward R. Korman
Page 48 of 56

received sentences of 60 to 119 months, and 0.5% of offenders received sentences of 120 months

or more. *See* Exhibit V.

Sentences of 60 months and above, which represent 3.4% of fraud sentences for

offenders in criminal history category I and 4.1% of fraud sentences for all offenders, are

appropriately reserved for the most serious fraud cases in this district. For example:

- **Vitaly Korchevsky** and **Vladislav Khalupsky** were convicted at trial of conspiracy to commit wire fraud, conspiracy to commit securities fraud, conspiracy to commit money laundering, computer intrusion and securities fraud, stemming from "their roles in an international scheme to hack into three business newswires and steal yet-to-be published press releases containing non-public financial information, which was then used to make trades that generated approximately $30 million in illegal profits." https://www.justice.gov/usao-edny/pr/two-defendants-convictedall-counts-international-computer-hacking-and-securities-fraud. The government recommended a guideline sentence of 135-168 as to Mr. Khalupsky, who was sentenced first. *U.S. v. Khalupsky*, 15-CR-381 (RJD), ECF No. 357 at 1. The Court imposed a sentence of 48 months. As to Mr. Korchevsky, the government recommended a sentence of 96 months, well below the Guideline sentences of 210 to 262 months, in part due to the sentence received by Mr. Khalupsky. Korchevsky made $15 million in personal profit on the scheme, while Mr. Khalupsky made less than $700,000. 14-CR-381 ECF No. 385 at 10. Despite this enormous gain to Mr. Korchesvsky, the Court sentenced him to 60 months, far below the sentencing guidelines and the government's recommendations.
- **Ercan Findikoglu** was a Turkish citizen who "was one of the masterminds behind three cyberattacks between 2011 and 2013 that inflicted more than $55 million in losses on the global financial system." U*.S. v. Findikoglu*, 13-CR-440 (KAM), ECF No. 35 at 1. His Guideline sentence was 135 to 168 months, and he was instead sentenced to 96 months.
- **Thomas Donovan**, along with two co-conspirators, stole $31 million from Ficus Investments, Inc. and had previously been involved with defrauding investors, though he had only civil rather than criminal judgments for his prior fraud. U.S. v. *Donovan*, 12-CR-196 (JS), ECF No. 104, at 1-2, 4. Pursuant to a plea agreement, his offense level was 29 (absent a plea agreement it would have been 34), and the government recommended he receive a guideline sentence of 87 to 108 months. *Id*. at 1. He was sentenced to 55 months' imprisonment.

As Judge Garaufis reasoned in in *U.S. v. Johnson*, "Where application of the loss

enhancement leads to a patently absurd sentence, it is appropriate for the court to rely more

heavily on the § 3553 factors." *U.S. v. Johnson*, 2018 WL at *4, *citing Corsey*, 723 F.3d at 380-

September 30, 2021
Honorable Edward R. Korman
Page 49 of 56

82 (Underhill, J., concurring). In *Johnson*, Judge Garaufis explained his reason for imposing a below-Guidelines sentence in a fraud case as follows: "Because the defendant's Guidelines sentence of 87-108 months is overwhelmingly due to the loss enhancement, and because I would find such a sentence well out of proportion to his appropriate sentence, I look closely at the  §3553 factors to guide the court to a reasonable sentence." *Johnson*, 2018 WL 1997975, at *4. Based on Mr. Johnson's status as a first time offender, the brevity of the offense, likely professional consequences, his medical condition, British citizenship and residence, as well as his strong history of community involvement, Judge Garaufis sentenced him to 24 months' imprisonment, a sentence that was less than one third of the low end of the advisory Guidelines.

The same reasoning applies here. Like Ms. Abboud, Mr. Johnson was convicted at trial. But Mr. Johnson's decision to hold the government to its burden did not change the calculus for the Court. The guideline is fundamentally flawed whether a defendant pleads guilty or goes to trial. While Ms. Abboud's advisory Guidelines range is 63-78 months, a sentence within this range is patently absurd. Ms. Abboud does not belong amongst the 3.4% of first-time Eastern District fraud offenders for which a sentence of greater than 60 months is appropriate. Rather, she belongs to the 82.4 percent of first-time fraud offenders for whom a sentence of under 24 months is appropriate. And in determining the appropriate sentence in this case, we ask the Court to consider Ms. Abboud's history and characteristics, including status as a first time offender, decades of domestic abuse, and strong history of community involvement and service – as well as the collateral consequences of Ms. Abboud's conviction, which are discussed more fully below.

September 30, 2021
Honorable Edward R. Korman
Page 50 of 56

### V.        THE COLLATERAL CONSEQUENCES OF MS. ABBOUD'S CONVICTION

In the Second Circuit, courts are free to consider the collateral consequences of a

conviction in determining the appropriate sentence. In *United States v. Stewart*, 590 F.3d 93 (2d

Cir. 2009), the district court—despite a Guidelines range of 78 to 97 months—sentenced the

defendant to 20 months' imprisonment in part because the "conviction made it doubtful that the

defendant could pursue his career as an academic or translator, and therefore that the need for

further deterrence and protection of the public is lessened because the conviction itself already

visits substantial punishment on the defendant." *Id*. at 141 (internal quotation marks omitted).

The circuit court affirmed, reasoning that the district court's analysis was "required by section

3553(a)," and commented: "It is difficult to see how a court can properly calibrate a 'just

punishment' if it does not consider the collateral effects of a particular sentence." *Id*. at 141–142.

The Second Circuit's embrace of collateral consequences as bearing upon the concept of

"just punishment," was also underscored in *United States v. Thavaraja*, 740 F.3d 253 (2d

Cir.2014), where the circuit court recognized that deportation is a permissible § 3553(a) factor.

See id. at 262–63.

There, the defendant, who was convicted of conspiracy to provide material support to a

foreign terrorist organization and conspiracy to bribe public officials, faced a guidelines sentence

of 240 months. *Id*. at 255, 257. The district court imposed a below-guidelines sentence of 108

months in light of several factors, among them that the defendant faced likely deportation upon

the completion of his sentence. *Id*. at 256. The Government argued that immigration

consequences of a conviction should not be considered by a sentencing judge, but the Second

Circuit disagreed. It explained: "In determining what sentence is 'sufficient, but not greater than

necessary,' to serve the needs of justice, a district court may take into account the uncertainties

September 30, 2021
Honorable Edward R. Korman
Page 51 of 56

presented by the prospect of removal proceedings and the impact deportation will have on the

defendant and his family." *Id*. at 262–63.

 While courts in this Circuit are free to consider the collateral consequences of a

conviction, it may not yet be common to do so. As Judge Bloch wrote in 2016,

> sufficient attention has not been paid at sentencing by me and lawyers—both
> prosecutors and defense counsel—as well as by the Probation Department in
> rendering its pre-sentence reports, to the collateral consequences facing a
> convicted defendant. And I believe that judges should consider such
> consequences in rendering a lawful sentence.

*United States v. Nesbeth*, 188 F. Supp. 3d 179, 180 (E.D.N.Y. 2016) Judge Bloch explained that

there are "a broad range of collateral consequences that serve no useful function other than to

further punish criminal defendants after they have completed their court-imposed sentences.

Many—under both federal and state law—attach automatically upon a defendant's conviction."

*Id*.

 The effects of these collateral consequences can be devastating. As Professor Michelle

Alexander has explained, "[m]yriad laws, rules, and regulations operate to discriminate against

ex-offenders and effectively prevent their reintegration into the mainstream society and

economy. These restrictions amount to a form of 'civi[l] death' and send the unequivocal

message that 'they' are no longer part of 'us.'"[25]

 Today, people convicted of felonies suffer restrictions in broad ranging aspects of life

that touch upon economic, political and social rights. As Professor Alexander writes,

> Today a criminal freed from prison has scarcely more rights, and arguably less
> respect, than a freed slave or a black person living "free" in Mississippi at the
> height of Jim Crow. Those released from prison on parole can be stopped and
> searched by the police for any reason ... and returned to prison for the most minor

---

[25] See Alexander, Michelle, The New Jim Crow: Mass Incarceration in the Age of Colorblindness (New York: The New Press, 2010), at p. 142.

September 30, 2021
Honorable Edward R. Korman
Page 52 of 56

> of infractions, such as failing to attend a meeting with a parole officer.... The
> "whites only" signs may be gone, but new signs have gone up—notices placed in
> job applications, rental agreements, loan applications, forms for welfare benefits,
> school applications, and petitions for licenses, informing the general public that
> "felons" are not wanted here. A criminal record today authorizes precisely the
> forms of discrimination we supposedly left behind—discrimination in
> employment, housing, education, public benefits, and jury service. Those labeled
> criminals can even be denied the right to vote.[26]

Here, Ms. Abboud has already lost her job, her reputation in the community, the trust and

support of many of her friends and colleagues, and the ability to work in her chosen field. She

faces significant restitution obligations in both the state and federal case. And as a person

convicted of a felony, she has lost the right to serve on a jury, and faces restrictions on holding

many professional licenses in New York State. When Ms. Abboud looks for job, applies for an

apartment, or seeks to further her education, she may face legal discrimination that effectively

shuts her out of these opportunities. Ms. Abboud, has, in fact, already faced such discrimination.

In the five years since her arrest, despite diligent efforts to secure gainful employment, Ms.

Abboud has worked sporadically, must now rely on public assistance to feed herself and her

minor son. And if she serves a prison that is longer than 15 months in any 22-month period, she

faces the possible termination of her parental rights.[27]

We respectfully ask the Court to take these collateral consequences into account when

determining the appropriate sentence for Ms. Abboud.

## VI.     SENTENCES RECEIVED BY CO-DEFENDANTS

Among the factors a sentencing court must consider in imposing a sentence is "the need

to avoid unwarranted sentencing disparities among defendants with similar records who have

---

[26]  *Id*. at 141.
[27]  N.Y. Soc. Serv. § 384- b(3)(l).

September 30, 2021
Honorable Edward R. Korman
Page 53 of 56

been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). In this regard, a district court may

compare co-defendants' sentences to avoid unwarranted sentencing disparities, *see United States*

*v. Wills*, 476 F.3d 103, 110 (2d Cir.2007), abrogated on other grounds by *United States v.*

*Cavera*, 550 F.3d 180 (2d Cir.2008); *see also United States v. Williams*, 524 F.3d 209, 216 (2d

Cir.2008).

In this case, Marcelle Bailey, who, according to the government, played a role with a

similar level of culpability to that of Ms. Abboud, received a sentence of 33 months. Given the

respective roles of Ms. Bailey and Ms. Abboud in the government's estimation, a Guidelines

sentence of 63-78 months for Ms. Abboud, a range that includes the possibility of a sentence

greater than two times the sentence received by Ms. Bailey, is grossly inequitable. It is also far

beyond any notion of a sentence that is sufficient, but not greater than necessary, to meet the

goals of sentencing under 18 U.S.C. §3553.

Beyond their respective roles, there are considerations in Ms. Abboud's case that

distinguish her from Ms. Bailey. Ms. Abboud was the victim of years of physical and emotional

abuse at the hands of her ex-husband, a trauma from which she continues to struggle. She is the

mother of a minor child whose only option if she is incarcerated is to live with this same abusive

person who has shown no interest in raising him or being a part of his life. Ms. Abboud has

already served four months in prison on a related state offense. And she has ongoing, unresolved

health issues.

Marcelle Bailey received a sentence of 33 months, which unfortunately anchors the

sentences that will follow. Counsel submits that Ms. Bailey's sentence, at the high end of the

applicable guidelines, was greater than necessary to accomplish the goals of sentencing. As

September 30, 2021
Honorable Edward R. Korman
Page 54 of 56

discussed above, a sentence of 22 months is greater than the sentences received by 82.4 percent

of first-time fraud offenders and 76.9 percent of all fraud offenders, regardless of criminal

history. Ms. Bailey's counsel should have provided this context, and did not. Ms. Bailey's

counsel also did not advance any arguments with respect to the flawed nature of the fraud

guidelines, discussed *supra*.

At Ms. Bailey's sentence, the government argued that Ms. Bailey committed the offense

knowing that people at disability agencies who committed healthcare fraud – including people

Ms. Bailey had worked with in the past – often got off with a slap on the wrist, even being

permitted to go back to work in the disability field after being convicted of crimes. The

government asked the Court to deter prospective offenders and send the message that healthcare

fraud would not be tolerated. Ms. Bailey's counsel did not respond to this argument. What he

could have said is that a sentence of nearly three years in prison  – a sentence higher than that

received than more than 80% of first time fraud offenders in this district – is greater than

necessary to send this message. A felony conviction, restitution, and a term of supervision would

have still made clear that defendants who are convicted of fraudulent acts are subject to serious

sanctions. Moreover, the disgrace of having been convicted of a felony, the collateral

consequences of a felony conviction, and a term of supervised release, would have been

sufficient to effect general deterrence for crimes of this nature. Ms. Bailey's sentence was greater

than necessary to achieve the goals of sentencing, and should not serve as an anchor for Ms.

Abboud's sentence in this case.

September 30, 2021
Honorable Edward R. Korman
Page 55 of 56

## VII.    THE APPROPRIATE SENTENCE

Wafa Abboud has lived a life devoted to serving others. She has spent three decades of her life – since 1994 – at organizations that help New Yorkers with disabilities. Twenty years ago, in 2001, she started Human First at her kitchen table, providing five clients with community habilitation in Brooklyn, all the while working two other jobs. While her conviction is an indelible stain on this record, it does not nullify her decades-long commitment to helping others.

Without any enhancement for the loss amount, Ms. Abboud's total offense level would be 12. She would have a base level of 7, pursuant to § 2B1.1(a)(1), plus 1 point because she was convicted of an 18 U.S.C. § 1957 offense,  plus 2 points for leadership role pursuant to  3B1.1(c), and 2 points for abuse of trust under § 3B1.3. With a criminal history category of I (as this is Ms. Abboud's first offense), she would be in the Zone C range of 10-16 months' imprisonment. We submit that this sentencing range, which approximates the average sentence for fraud offenses in this district, is the appropriate starting point for the Court's consideration in this case.

Ms. Abboud has been convicted of  a serious crime. But we hope your Honor will view this conviction in the context of a life of hard work, sacrifice, and dedication to family, friends, and to the vulnerable population she served. We also ask the Court to consider the four months that Ms. Abboud has already served on the related state tax fraud case, as well as the collateral consequences she will suffer as a person with state and federal felony convictions, and the consequences she has already suffered.

Additionally, the COVID-19 pandemic has not yet been resolved in the Bureau of Prisons, where there is continued resistance to vaccination among the corrections staff and prisoner population.. Given that Ms. Abboud has a number of physical ailments, she is at increased risk of serious consequences were she to become ill. If your Honor is inclined to

September 30, 2021
Honorable Edward R. Korman
Page 56 of 56

sentence Ms. Abboud to a term of incarceration, counsel urges the Court to consider a sentence

that can be served on home confinement – which would permit Ms. Abboud the limited freedom

to work, to parent and to continue with her religious commitment.

Ms. Abboud is a broken person, but she is a person who yearns to prove herself and

rebuild. We ask that this Court consider a non-incarcerative sentence with a community service

component that will permit Ms. Abboud to care for her minor son, support her young adult

daughters, and to pay her debt to society as a contributing, tax-paying member of that society.

Thank you for your kind consideration of this letter.

Respectfully,

Sarah Kunstler
Beena Ahmad
Attorneys for Wafa Abboud


CC:     AUSA Robert Polemeni, By Electronic Mail

Wafa Abboud